IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARION F. WHITE, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 06-241 J |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff, Marion F. White, Jr., seeks judicial review of a decision of Defendant, Commissioner of Social Security ("the Commissioner"), denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Presently before the Court are the parties' cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, (a) Plaintiff's motion for summary judgment will be granted; (b) the Commissioner's motion for summary judgment will be denied; and (c) the case will be remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion.

## II. **Procedural History**

Plaintiff filed an application for DIB on June 7, 2004,

alleging disability since February 2, 2004 due to prostrate

cancer, a liver problem and exposure to tuberculosis ("TB").

(Certified Copy of Record before the Social Security

Administration, Docket No. 9, "R." at 71-73, 118). Following

the denial of Plaintiff's application for DIB on August 30,

2004, he requested a hearing before an Administrative Law Judge

("ALJ"). (R. 42-47, 48-49). At the hearing, which was held on

April 7, 2005, Plaintiff, who was represented by counsel, and a

vocational expert ("VE") testified. (R. 24-41). With respect

to his alleged disabling conditions, Plaintiff testified that

the medical problems which interfere with his ability to work

are arthritis in his back and hands, bone spurs in his feet and

pain on his left side that interferes with his ability to sleep

through the night.[1]  (R. 30-31). Plaintiff, who is a veteran,[2]

testified further that all of his medical treatment has been

provided by the Veterans Administration. (R. 31).

On May 2, 2005, the ALJ issued a decision denying

Plaintiff's application for DIB. Specifically, the ALJ

---

[1]As a result of Plaintiff's inability to sleep well at
night, he testified that he naps on a daily basis. (R. 31).

[2]Plaintiff was in the United States Army from November 24,
1972 to December 26, 1972. (R. 27, 278). He received a medical
discharge before completing basic training. (R. 275).

2

concluded that Plaintiff retained the residual functional capacity ("RFC") to perform his past relevant work.[3]  (R. 16-23).  Plaintiff requested review of the ALJ's decision.  (R. 12).  However, the request was denied by the Appeals Council on October 13, 2006, rendering the ALJ's decision the final decision of the Commissioner.[4]  (R. 4-8 ).  This appeal followed.

### III.  Personal Background and Medical Evidence

Plaintiff was born on February 15, 1954.  He was 51 years old at the time of the hearing before the ALJ.  (R. 26, 71).  Plaintiff is a high school graduate.  In the past, Plaintiff has

---

[3]Under the Social Security Regulations, RFC is defined as the most a claimant can still do despite his or her limitations. 20 C.F.R. § 404.1545.  Plaintiff's past relevant work includes jobs as a truck driver and a forklift operator.  (R. 107).  At the hearing before the ALJ, the VE testified that Plaintiff's past relevant work as a forklift operator was semi-skilled, medium work, and his past relevant work as a truck driver was semi-skilled, heavy work.  The Social Security Regulations define medium and heavy work as follows: "Medium work involves lifting no more than 50 pounds at a time with frequent lifting and carrying of objects weighing up to 25 pounds."  "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds."  20 C.F.R. § 404.1567.

[4]Plaintiff submitted additional medical evidence to the Appeals Council with his request for review of the ALJ's decision.  However, because all of the additional medical evidence post-dated the ALJ's May 2, 2005 decision, the Appeals Council declined to consider it and advised Plaintiff that he would have to submit a new application for DIB if he wanted the Social Security Administration to consider whether he was disabled after May 2, 2005.  (R. 4-8).

3

been employed as a truck driver and a forklift operator.[5] (R. 119, 122). However, he has not worked since September 2003. (R. 28).

On January 30, 2004, Plaintiff was evaluated for admission to the Substance Abuse Treatment Unit ("SATU") at the Veterans Administration Medical Center in Coatesville, Pennsylvania ("Coatesville VAMC") due to drug and alcohol dependency. During the evaluation, Plaintiff denied any acute medical problems or any previous symptoms of psychiatric illness.[6] With regard to employment, the report of the evaluation states that Plaintiff "is currently unemployed due to his addiction." Plaintiff met the criteria for admission to the SATU, and he was admitted on February 2, 2004.[7] (R. 197).

The report of Plaintiff's history and physical examination on February 2, 2004 indicates that Plaintiff's chief concern was "[t]o stop using alcohol, heroin and cocaine." As to

---

[5]Between 1990 and 1999, Plaintiff worked as a truck driver. Due to numerous traffic tickets and an inability to pay the fines which resulted in the loss of his commercial driver's license, Plaintiff could no longer work as a truck driver. From 2001 to 2003, Plaintiff worked as a forklift operator for the Mt. Olive Pickle Company in North Carolina on a seasonal basis. (R. 278-79).

[6]Although Plaintiff denied any symptoms of psychiatric illness, he did report feeling depressed due to the death of his wife from a drug overdose in 2000 and the murder of a cousin in 2003. (R. 197, 199).

[7]At the time of his admission to the SATU at the Coatesville VAMC, Plaintiff was homeless. (R. 203, 230).

4

Plaintiff's physical condition, despite apparently denying any acute medical problems at the time of his SATU admission evaluation on January 30, 2004, the report of Plaintiff's history and physical examination on February 2, 2004 indicates that Plaintiff reported suffering from cervical and lumbar back pain since a motor vehicle accident in 2001 which rendered him immobile on some days and caused pain throughout the whole left side of his body;[8] that Plaintiff reported numbness in his fingers and hands; and that Plaintiff reported frequent headaches and blood in his stool. (R. 199). With respect to his sleep pattern, Plaintiff reported that he received an average of 2 hours of uninterrupted sleep per night, and that, as a result, he had to nap during the day. (R. 205). Plaintiff's physical examination revealed, among other things, "pain right cervical spine area to ROM," "tender over L/S spine with paravertebral muscle spasm L/S spine," and "bilateral bunions."[9] The initial impression was described as follows: "alcohol dependence, cont[inuous], heroin dependence, cont[inuous], cocaine dependence, cont[inuous], nicotine

---

[8]Plaintiff's participation in recreational activities was limited upon his admission to the SATU due to his neck and back pain. (R. 215).

[9]A bunion is when your big toe points toward the second toe. This causes a bump on the edge of your foot, at the joint of your big toe. The condition may become painful as extra bone and a fluid-filled sac grow at the base of the big toe. www.nlm.nih. gov/medlineplus/encyclopedia (last visited on 7/9/2007).

dependence, depression, [gastrointestinal] bleed upper and lower when drinking/per vet history, hepatomegaly,[10] mycosis feet and hands,[11] and bunions." (R. 200).

A February 3, 2004 report indicates that Plaintiff was prescribed the following medications, lotion, supplements and test at the time of his admission to the SATU: acetaminophen (as needed for neck and back pain and headaches), aqua-aquaphor (Eucerin for dry skin), folic acid, Lorazepam (for shaking and sweating), Methocarbamol (for muscle spasm), Terbinafine

---

[10]Hepatomegaly is defined as "enlargement of the liver." www.nlm.nih.gov/medlineplus/mplusdictionary (last visited on 7/9/2007). An abdominal echogram performed on February 18, 2004 showed that Plaintiff had hepatomegaly (R. 172), and a medical record of the Coatesville VAMC dated February 20, 2004 states that Plaintiff has alcoholic liver disease with hepatomegaly and mildly elevated liver enzymes. (R. 257).

[11]Mycosis is defined as "infection with or disease caused by a fungus." www.nlm.nih.gov/medlineplus/mplusdictionary (last visited on 7/9/2007).

6

(Lamisil for feet and hands), thiamine and Tuberculin, PPD.[12]
(R. 210).

On February 6, 2004, Plaintiff was seen by his primary care
physician at the Coatesville VAMC for a complaint of abdominal
pain, and medication was prescribed. (R. 231). Plaintiff
continued to complain of abdominal pain, and, on February 18,
2004, he was assessed as suffering from cholecystitis.[13] Cipro
and Ultram were prescribed.[14] (R. 253). A scan on February 24,

[12]Acetaminophen is used to relieve mild to moderate pain
from, among other things, headaches, muscle aches and backaches.
Folic acid is used to treat or prevent folic acid deficiency. It
is a B-complex vitamin needed by the body to manufacture red
blood cells. A deficiency of this vitamin causes certain types
of anemia (low red blood cell count). Lorazepam is used to
relieve anxiety. Methocarbamol, a muscle relaxant, is used with
rest, physical therapy and other measures to relax muscles and
relieve pain and discomfort caused by strains, sprains and other
muscle injuries. Terbinafine is used to treat fungal infections
of the toenail and fingernail. Thiamine is a vitamin used by the
body to break down sugars in the diet. The medication helps
correct nerve and heart problems that occur when a person's diet
does not contain enough Thiamine. www.nlm.nih.gov/medlineplus
/druginfo (last visited on 7/9/2007). PPD is an acronym for
"purified protein derivative." www.nlm.nih.gov/medlineplus
/mplusdictionary (last visited on 7/9/2007). A PPD test is a
skin test for TB. If a person has a positive PPD test, but a
chest x-ray does not show spots or shadows, the person has TB
infection and not active TB disease. www.nlm.nih.gov/medlineplus
/druginfo (last visited on 7/9/2007).

[13]Cholecystitis is a sudden inflammation of the gallbladder
that causes severe abdominal pain. www.nlm.nih.gov/medlineplus
/encyclopedia (last visited on 7/9/2007).

[14]Cipro is an antibiotic used to treat or prevent certain
infections caused by bacteria. Ultram is used to relieve
moderate to moderately severe pain. www.nlm.nih.gov/medlineplus
/drug info (last visited on 7/9/2007). A pain evaluation note
dated February 20, 2004 indicates that Plaintiff reported a pain

7

2004, however, showed no evidence of cholecystitis.  When

questioned further, Plaintiff reported that he had been

suffering from right side abdominal pain for at least a year

prior to his admission to the SATU, but drinking alcohol had

suppressed the pain.  (R. 260).  Plaintiff also reported chronic

lumbar pain radiating into his right leg which made it difficult

to walk distances.  Plaintiff's physical examination showed

tenderness over the right side lumbar paraspinal muscles and

decreased range of motion "with bending down."  (R. 261).

Plaintiff successfully completed his treatment for drug and

alcohol dependency in the SATU and, on March 3, 2004, he was

cleared for transfer to the domiciliary program at Coatesville

VAMC.[15]  (R. 269).  At this time, Plaintiff was still

experiencing abdominal pain and his PSA level was elevated.[16]

(R. 270).  On March 8, 2004, Plaintiff was seen by an infectious

level of 5 out of 10 and states: "[Plaintiff] is not a
complainer, follow (sic) instruction well, doesn't like to be in
bed."  (R. 257).

[15]Because Plaintiff was homeless at the time of his admission
to the SATU, he sought placement in the domiciliary program upon
completion of his substance abuse treatment.  (R. 236).

[16]PSA is an acronym for "prostate-specific antigen."
www.nlm.nih.gov/medlineplus/mplusdictionary (last visited on
7/9/2007).  PSA is a protein produced by the cells of the
prostate gland.  It is normal for men to have low levels of PSA
in their blood; however, prostate cancer or benign conditions can
increase PSA levels.  The United States Food and Drug
Administration has approved the PSA test along with a digital
rectal exam to help detect prostate cancer in men age 50 and
older.  www.cancer.gov (last visited on 7/9/2007).

8

disease specialist at the Coatesville VAMC for a positive TB
test.[17]  The impression was described as TB infection without
disease, and Plaintiff was prescribed INH 300 mg daily for 9
months.[18]  (R. 290).

A March 12, 2004 treatment plan completed for Plaintiff
upon his transfer to the domiciliary program at the Coatesville
VAMC included a section relating to employment.  The objective
for Plaintiff was described as follows: "Veteran will complete
job skills classes and obtain a CWT assignment prior to seeking
employment in the community."[19]  The long range goal for
Plaintiff was described as follows: "Veteran will complete all
phase (sic) of the domiciliary program, obtain full time
employment, secure affordable housing, and maintain sobriety."
(R. 295-300).

---

[17]Also on March 8, 2004, Plaintiff saw his primary care
physician at the Coatesville VAMC for a complaint of rectal
bleeding the previous week.  Hemorrhoids were noted, and
Plaintiff was given medication.  (R. 284).

[18]INH, or Isoniazid, is used alone or with other drugs to
treat TB and to prevent it in people who have had contact with TB
bacteria.  www.nlm.nih.gov/medlineplus/druginfo (last visited on
7/9/2007).

[19]CWT is an acronym for "Compensated Work Therapy."
Plaintiff completed all of the job skills classes by March 25,
2004.  (R. 307).  On March 26, 2004, Plaintiff executed a
Statement of Understanding concerning his participation in CWT
for work evaluation.  For domiciliary patients, CWT is limited to
20 work days, and a patient is expected to save 70% of his CWT
earnings for later use in his job search.  (R. 310-11).

9

On March 24, 2004, Plaintiff was seen by a physician assistant for complaints of blurred vision and pain in his right hand. An examination of Plaintiff's hand showed that the joints were slightly swollen. Plaintiff was diagnosed with arthralgia of the joints in his right hand and a vision impairment. Naprosyn was prescribed for Plaintiff,[20] and an optometry consult was ordered. (R. 307). A pain evaluation note dated March 31, 2004 indicates that Plaintiff reported aching pain in his hips and knees which impacted his ability to walk. (R. 314).

On April 7, 2004, Plaintiff underwent a biopsy of his prostate (R. 316, 325),[21] and, on April 27, 2004, Plaintiff was diagnosed with prostate cancer.[22]   (R. 318, 337). A nursing note dated May 27, 2004 indicates that Plaintiff reported suffering from pain "everyday" in his low back, groin and bilateral

_____

[20]Naprosyn is prescribed to relieve pain, tenderness, swelling and stiffness caused by arthritis. www.nlm.nih.gov /medlineplus/druginfo (last visited on 7/9/2007).

[21]Also on April 7, 2004, Plaintiff attended a group therapy session in which expectations for life after the domiciliary program at the Coatesville VAMC were discussed. The note of this group therapy session states in relevant part: "[Plaintiff] was attentive during the session, but his medication does make him drowsy and he was fighting sleep throughout the discussion."   (R. 325).

[22]A note by a health technician dated May 19, 2004 indicates that Plaintiff was informed the cancer may have spread to his liver. (R. 344). In an individual therapy session on May 19, 2004, Plaintiff informed the therapist that in addition to the diagnosis of prostate cancer, he had been told there was a spot on his liver. (R. 346).

10

inguinal areas.  Plaintiff's pain complaints were discussed with the urology clinic and the back pain was believed to be caused by degenerative spinal arthritis, rather than metastasis.[23] Flexeril was prescribed for Plaintiff,[24] and he was instructed to rest in bed.[25]  (R. 348-50).  On May 28, 2004, Plaintiff had an optometry consult for his complaints of blurred vision.  The impression was described as follows: "Presbyopia, Hyperopia, Astigmatism, Mild/Early Cataracts, immature."  (R. 349-50).

During an individual therapy session on June 8, 2004, Plaintiff reported continued pain in his low back, groin and upper thighs.  He also reported difficulty sleeping due to pain and thoughts about his cancer diagnosis.  (R. 354).  During an individual therapy session on June 16, 2004, Plaintiff described himself as "tired," and he continued to complain of pain in his

---

[23]Metastasis is the movement or spreading of cancer cells from one organ or tissue to another.  www.nlm.nih.gov/medlineplus /encyclopedia (last visited on 7/9/2007)

[24]Flexeril is a muscle relaxant used with rest, physical therapy and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries. www.nlm.nih.gov/medlineplus/druginfo (last visited on 7/9/2007).

[25]An addendum to a vocational treatment plan dated May 17, 2004 indicates that Plaintiff successfully completed his 20-day CWT assignment as a priority messenger delivering messages throughout a prescribed route.  Due to Plaintiff's recent diagnosis of prostate cancer and need for treatment, however, he requested, and was granted, continuation in CWT until his surgery.  (R. 318).  Due to medical appointments and orders of bed rest at various times, Plaintiff's participation in CWT after May 17, 2004 was intermittent.  (R. 319, 320, 321, 366, 373, 374, 382, 393, 407).

11

back, groin and upper legs to knees. (R. 357). On June 25, 2004, Plaintiff was seen by his primary care physician for complaints of pain in the joints of his lower extremities, reporting that he had been riding a bike on June 21, 2004. The diagnosis was osteoarthritis of the joints of Plaintiff's lower extremities, and his dosage of Naprosyn was increased. (R. 359). A pain evaluation note dated June 28, 2004 indicates that Plaintiff reported throbbing pain which impacted his general activity and ability to walk. (R. 360).

On July 8, 2004, Plaintiff had a follow-up urology visit during which treatment options and recent ultrasound tests of his kidneys, bladder and scrotum were discussed. Plaintiff decided to undergo prostate surgery, and the surgery was scheduled for October 5, 2004. (R. 138-39). Plaintiff continued to complain of pain in his groin throughout July (R. 366, 367, 368, 370), and, on July 28, 2004, he informed a health technician that his pain medication made him drowsy. (R. 371).

On August 3, 2004, during an individual therapy session, Plaintiff reported continued pain in his groin, back and upper legs, as well as painful and swollen hands which interfered with his ability to fully participate in the "piece work" assigned to him as part of CWT. (R. 372). During an individual therapy session on August 10, 2004, Plaintiff reported ongoing physical pain which disrupted his sleep and resulted in Plaintiff taking

12

naps during the day.[26]  (R. 373).  During his individual therapy session on August 17, 2004, Plaintiff was yawning and appeared sleepy, reporting that he had just awakened from a nap. Plaintiff also reported recent knee pain and swelling and pain from a hydrocele.[27]  (R. 375).

A note by a health technician dated August 29, 2004 indicates that Plaintiff complained about having "little energy" and the failure of his pain medication to "treat his pain at a level where he is comfortable."  (R. 379).  A pain evaluation note dated September 2, 2004 indicates that Plaintiff reported a pain level of 5 out of 10 in his hands, low back and feet which interfered with his general activity and ability to walk.  (R. 380).  The next day, Plaintiff was seen by his primary care physician for pain in his feet, as well as pain in the cervical area radiating down his left arm.  Plaintiff was referred for a podiatry consult to rule out a bone spur of the left heel and x-rays of Plaintiff's cervical spine were ordered.  (R. 381-82). During his individual therapy session on September 8, 2004, the therapist noted that Plaintiff appeared to be in physical

---

[26]In fact, Plaintiff arrived 10 minutes late for this individual therapy session because he had fallen asleep.  (R. 373).

[27]A hydrocele is a fluid-filled sac that surrounds a testicle, causing swelling of the scrotum.  www.mayoclinic.com (last visited on 7/9/2007).  A scrotum echogram on May 18, 2004 showed that Plaintiff had bilateral hydroceles, the left hydrocele being larger than the right.  (R. 167).

13

discomfort, describing his pain level as 6 out of 10. (R. 383). A nursing note dated September 9, 2004 indicated that Plaintiff reported throbbing pain in his neck, hands and feet which was aggravated by walking, lifting and standing. (R. 383-84). At this time, Plaintiff was taking, among other medications, Tylenol for joint pain, Flexeril for back spasm, Naprosyn for right hand and neck pain and Ultram for severe pain. (R. 384-85).

During his individual therapy sessions on September 14 and September 21, 2004, Plaintiff reported continued pain levels of 6 out of 10. (R. 386, 389). X-rays of Plaintiff's cervical spine on September 20, 2004 showed discogenic disease and spondylosis at C5-6, but no fracture or dislocation.[28] (R. 166).

Plaintiff underwent a radical prostatectomy on October 12, 2004 at the VAMC in Philadelphia, Pennsylvania for his prostate cancer. (R. 395). During a visit with his primary care physician at the Coatesville VAMC on October 18, 2004, Plaintiff reported that his surgery "went well." (R. 397). A note by a social worker dated October 29, 2004 indicates that Plaintiff

---

[28]Cervical spondylosis results from chronic degeneration of the cervical spine including the cushions between the neck vertebrae and joints between the bones of the cervical spine. The accumulated changes caused by degeneration can gradually compress one or more of the nerve roots. This can lead to increasing pain in the neck and arm, weakness and changes in sensation. www.nlm.nih.gov/medlineplus/encyclopedia (last visited on 7/9/2007).

14

stated his attending physician believed the prostate cancer
surgery was successful.   (R. 406).

## IV.   Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under Section
405(g) of the Social Security Act, which provides that an
individual may obtain judicial review of any final decision of
the Commissioner by bringing a civil action in the district
court of the United States for the judicial district in which
the individual resides.   Based upon the pleadings and the
transcript of the record, the district court has the power to
enter a judgment affirming, modifying or reversing the
Commissioner's decision with or without a remand for a
rehearing.   42 U.S.C. § 405(g).

The Court's review of the Commissioner's decision is
limited to determining whether the decision is supported by
substantial evidence, which has been described as "such relevant
evidence as a reasonable mind might accept as adequate to
support a conclusion."   Richardson v. Perales, 402 U.S. 389, 401
(1971).   It consists of something more than a mere scintilla,
but something less than a preponderance.   Dobrowolsky v.
Califano, 606 F.2d 403, 406 (3d Cir.1979).   Even if the Court
would have decided the case differently, it must accord
deference to the Commissioner and affirm the findings and

decision if supported by substantial evidence.  Monsour Medical
Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

## V.  Legal Analysis

### A.  The ALJ's Decision

In order to establish a disability under the Social
Security Act, a claimant must demonstrate an inability to engage
in any substantial gainful activity due to a medically
determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to
last for a continuous period of not less than 12 months.  42
U.S.C. § 423(d)(1).  A claimant is considered unable to engage
in any substantial gainful activity only if his physical or
mental impairment or impairments are of such severity that he is
not only unable to do his previous work but cannot, considering
his age, education, and work experience, engage in any other
kind of substantial gainful work which exists in the national
economy.  42 U.S.C. § 423(d)(2)(A).

In Burnett v. Commissioner of Social Security Admin., 220
F.3d 112 (3d Cir.2000), the United States Court of Appeals for
the Third Circuit discussed the procedure an ALJ must follow in
evaluating a claim for Social Security disability benefits,
stating in relevant part:

*    *    *

16

In <u>Plummer</u>, we recounted the five step sequential evaluation for determining whether a claimant is under a disability, as set forth in 20 C.F.R. § 404.1520:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a). If a claimant is found to be engaged in substantial gainful activity, the disability claim will be denied. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140, 107 S.Ct. 2287, 2290-91, 96 L.Ed.2d 119 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.

> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. <u>Adorno v. Shalala</u>, 40 F.3d 43, 46 (3d Cir.1994).

> If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effects of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.

<u>Plummer</u>, 186 F.3d at 428.

\*      \*      \*

220 F.3d at 118-19.

With respect to the ALJ's application of the sequential
evaluation process in the present case, steps one and two were
resolved in Plaintiff's favor: that is, the ALJ found that
Plaintiff had not engaged in substantial gainful activity since
his alleged onset date of disability, and the medical evidence
established that Plaintiff is status post prostate cancer and
suffers from depression, drug and alcohol abuse (in remission)
and arthritis,[29] which are severe impairments.[30]  (R. 17-18).

---

[29]In his findings regarding Plaintiff's impairments, the ALJ
states that although Plaintiff alleged a liver disorder, there is
no medical evidence to corroborate a liver impairment.  (R. 22).
This statement is clearly erroneous.  As noted in footnote 10 of
this Memorandum Opinion, an abdominal echogram on February 18,
2004 showed that Plaintiff had hepatomegaly or enlargement of the
liver, and a medical record dated February 20, 2004 states that
Plaintiff has alcoholic liver disease with hepatomegaly and
mildly elevated liver enzymes.  However, there is no evidence
that Plaintiff's liver impairment causes any work-related
physical limitations.  Similarly, there is no evidence that
Plaintiff's previous surgery for prostate cancer and history of
drug and alcohol abuse result in any work-related physical
limitations.  Thus, on remand, the ALJ's focus should be on
Plaintiff's well-documented neck, back and foot pain, which is
consistent with Plaintiff's testimony at the hearing before the
ALJ regarding the impairments which interfere with his ability to
work.  (R. 30).

[30]In connection with step two of the sequential evaluation
process, the ALJ stated: "At first glance, it appears that all of
Mr. White's impairments are not 'severe' impairments as defined
by the Act.  However, due to his allegations of pain resulting
from his impairments, and in the interest of fairness to
claimant, his impairments will be examined and treated as though
they are severe."  (R. 18).

18

Turning to step three, the ALJ found that Plaintiff's impairments were not sufficiently severe to meet or equal the requirements of any listing in 20 C.F.R., Pt. 404, Subpt. P, App. 1.[31] (R. 18). As to step four, the ALJ found that Plaintiff could perform his past relevant work as a forklift operator and truck driver, and, therefore, he was not disabled. (R. 21). In light of his step four determination, the ALJ did not address step five of the sequential evaluation process.

## B. Plaintiff's Motion for Summary Judgment

In support of his motion for summary judgment seeking the remand of this case for further consideration, Plaintiff raises several arguments which will be addressed by the Court. First, Plaintiff argues that the ALJ improperly assessed his RFC,[32] and, therefore, erred at step four of the sequential evaluation process in finding that he could perform his past relevant work as a forklift operator and truck driver. Second, Plaintiff

---

[31]Plaintiff does not challenge the ALJ's determination at step three of the sequential evaluation process.

[32]As noted by Plaintiff, there is an inconsistency in the ALJ's decision to treat his arthritis as a severe impairment and then determine that Plaintiff has no exertional limitations with respect to his RFC. (Pl's Brief, p. 5). Under the Social Security Regulations, a severe impairment is one which significantly limits an individual's physical ability to do basic work activities. See 20 C.F.R. § 404.1520(c).

19

argues that the ALJ erred with respect to his adverse
credibility finding.[33]

i

Regarding Plaintiff's first argument, the Court agrees that
a remand of this case for further proceedings is necessary.
Because the ALJ decided to treat Plaintiff's impairments (status
post prostate cancer, depression, drug and alcohol abuse (in
remission) and arthritis) as if they were severe impairments at
step two of the sequential evaluation process,[34] and because the

---

[33]Plaintiff also argues that the ALJ erred by failing to pose
an accurate hypothetical question to the VE and that the VE's
testimony contained an unexplained inconsistency with the
Dictionary of Occupational Titles.  (Pl's Brief, pp. 6-8).
Because the VE's testimony was not necessary to the ALJ's
determination at step four of the sequential evaluation process
that Plaintiff was not disabled, and because the Court concludes
that the case must be remanded for further consideration of
Plaintiff's RFC and the ALJ's credibility determination, the
Court declines to address these additional arguments.

[34]The ALJ's application of the five-step sequential
evaluation process in this case was seriously flawed.
Specifically, in his decision, the ALJ indicated in connection
with step two that none of Plaintiff's impairments were severe.
(R. 18).  Thus, the ALJ's inquiry should have concluded at step
two as provided in 20 C.F.R. § 404.1520(a)(4).  Instead, the ALJ
opted to "treat" Plaintiff's impairments as if they were severe
and proceed to steps three and four of the sequential evaluation
process.  Then, after concluding that Plaintiff retained the RFC
to perform his past relevant work at step four, the ALJ proceeded
to obtain VE testimony which was unnecessary in light of the
determination at step four that Plaintiff was not disabled.  VE
testimony would have been required only if the burden had shifted
to the Commissioner at step five to show that although Plaintiff
could not perform his past relevant work, he retained the RFC to
perform other work existing in significant numbers in the
national economy.

20

ALJ found that Plaintiff's impairments did not meet the
requirements of any impairment listed in the Social Security
Regulations at step three of the sequential evaluation process,
he was required to assess Plaintiff's RFC before proceeding to
step four.  With respect to Plaintiff's physical RFC, the ALJ
found that Plaintiff had no exertional limitations.[35]  (R. 21).
As noted by Plaintiff, in making this determination, the ALJ
relied on (1) an alleged lack of medical evidence indicating
that Plaintiff's impairments limited his ability to engage in
work-related physical activity; (2) the fact that Plaintiff
participated in CWT while a patient in the domiciliary program
at the Coatesville VAMC; and (3) the lack of any opinion by a
treating physician that Plaintiff's ability to walk, stand, sit
or lift was limited by his impairments.  (Pl's Brief, p. 3).

Contrary to the ALJ's reliance on an alleged lack of
medical evidence to support a finding of work-related exertional

---

[35]Plaintiff also argues that the ALJ erred in assessing his
mental RFC.  After consideration, the Court concludes that
substantial evidence supports the ALJ's mental RFC assessment in
this case.  Specifically, in finding that Plaintiff's depression
did not result in more than mild limitations in his activities of
daily living, social functioning and concentration, persistence
or pace and did not result in repeated episodes of decompensation
each of extended duration, the ALJ cited the Psychiatric Review
Technique form completed by a state agency psychological
consultant, Louis D. Poloni, Ph.D., based on a review of
Plaintiff's file, as well as the records of the Coatesville VAMC
(R. 20-21), which clearly support the ALJ's determination
regarding Plaintiff's mental RFC.

21

limitations, the medical evidence in this case includes records
containing numerous notations of Plaintiff's complaints of neck,
back and foot pain and the pain's effect on his ability to
engage in work-related physical activities such as walking,
standing and lifting (R. 199, 261, 314, 360, 380, 383-84), as
well as diagnostic studies providing objective evidence of a
basis for Plaintiff's pain complaints (R. 166) and consistent
notes of treatment for neck, back and foot pain.  Turning to
Plaintiff's participation in CWT while he was a patient in the
domiciliary program at the Coatesville VAMC, as noted by
Plaintiff, the record is devoid of any evidence concerning the
physical demands of the work assigned to Plaintiff or the number
of hours worked by Plaintiff during a given day.  (Pl's Brief,
p. 4).  Accordingly, his participation in CWT provides no basis
for concluding that Plaintiff could perform his past relevant
jobs as a forklift operator and truck driver which involved
medium and heavy work, respectively, on a regular and continuing
basis.[36]  Finally, as to the ALJ's reliance on the absence of an

---

[36]Social Security Rulings are agency rulings published "under
the authority of the Commissioner of Social Security" and "are
binding on all components of the Social Security Administration."
Sykes v. Apfel, 228 F.3d 259, 271 (3d Cir.2000).  With respect to
RFC determinations, Social Security Ruling 96-8p states: "... RFC
is the individual's *maximum* remaining ability to do sustained
work activities in an ordinary work setting on a **regular and
continuing** basis, and the RFC assessment must include a
discussion of the individual's abilities on that basis.  A
'regular and continuing basis' means 8 hours a day, for 5 days a

opinion by a treating physician regarding Plaintiff's ability to perform work-related physical activity, this fact supports the Court's conclusion that the case must be remanded for further proceedings. Rather than relying on the opinion of a treating physician or a consultative examiner concerning the exertional work-related limitations resulting from Plaintiff's well-documented neck, back and foot problems, the ALJ relied on his own lay opinion which is clearly impermissible. See Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.1999)(An ALJ may not make speculative conclusions without any supporting evidence). On remand, the Commissioner is directed to obtain a medical source statement from Plaintiff's treating physician at the Coatesville VAMC concerning his ability to engage in specific work-related physical activities on a regular and continuing basis in light of his neck, back and foot pain during the relevant time period or a report from a consultative examiner on this issue.[37]

---

week, or an equivalent work schedule." (Emphasis in original).

[37]In this connection, the Court notes that 20 C.F.R. § 404.1545(a)(3) provides in relevant part: "We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.... However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources...."

23

ii

Plaintiff also argues that the ALJ erred with respect to his adverse credibility determination. After consideration, the Court agrees.

Regarding an alleged inconsistency between Plaintiff's hearing testimony and the evidence in this case, the ALJ stated in his decision that Plaintiff testified he last worked as a truck driver in September 2003 and left this job because he became ill, while Plaintiff allegedly informed a therapist at the Coatesville VAMC on March 4, 2004 that he left the truck driving job due to an inability to pay the fines assessed against him for traffic violations. (R. 17). As to Plaintiff's hearing testimony concerning his last employment, at best, the testimony is unclear. While the ALJ stated in his decision that Plaintiff testified he left his last job because he became ill, the Court's review of the hearing transcript shows that Plaintiff testified he left his last job because he "[c]ouldn't get to work." Moreover, due to the inaudibility of Plaintiff's response to the ALJ's inquiry concerning his last job, it is impossible to determine the job to which Plaintiff was referring.[38]  (R. 28). As to the ALJ's reliance on a therapist's

_____

[38]In fact, the hearing transcript indicates that Plaintiff's entire testimony was, in large part, inaudible (R. 27-35), which also supports the Court's decision to remand this case for further proceedings.

24

note to find an inconsistency between Plaintiff's testimony and the record, the ALJ misread the March 4, 2004 record of the Coatesville VAMC which he cited. Specifically, that record indicates the **last** job Plaintiff held was the forklift operator job, while the **longest** job Plaintiff held was the job of a truck driver which he left in 1999 due to an inability to pay the fines resulting from traffic tickets.[39]  (R. 278-79). Under the circumstances, the ALJ's first stated reason for his adverse credibility determination is erroneous.

Next, the ALJ found Plaintiff to be less than credible based on Plaintiff's alleged testimony that his drug and alcohol abuse had been in remission for two years. Specifically, the ALJ stated:

> In his testimony, the claimant stated that he has been in rehab for two years and his alcohol and drug abuse are in complete remission for the past two years. The medical record does indicate that Mr. White entered the drug rehabilitation program on January 30, 2004 (Exhibit 5-F). The medical record clearly indicates that Mr. White's drug and alcohol abuse have been in remission since January 2004, a period of fifteen months, not twenty-four months as alleged.

(R. 17).

_____

[39]In this connection, the Court notes that the record in this case clearly establishes that Plaintiff last worked as a forklift operator, not as a truck driver, and that he quit his truck driving job in 1999 due to the loss of his commercial driver's license as a result of numerous traffic tickets and a financial inability to pay the fines.  (R. 107, 119, 220, 237, 278-79, 292).

Again, the Court's review of the hearing transcript does not support the ALJ's characterization of Plaintiff's testimony. According to the hearing transcript, when asked about his past drug and alcohol problem by the ALJ, Plaintiff testified that he had "been in rehab for eleven months" (R. 30), not twenty-four months as stated by the ALJ. Moreover, at the time of the hearing in this case on April 7, 2005, it had been approximately fourteen months since Plaintiff's admission to the SATU at the Coatesville VAMC on February 2, 2004. Thus, the hearing transcript shows that Plaintiff underestimated, rather than exaggerated, the period of time in which his drug and alcohol abuse had been in remission, providing no support for the ALJ's adverse credibility determination.[40]

Next, the ALJ found Plaintiff to be less than credible based on the alleged failure of the medical evidence to substantiate Plaintiff's allegations, stating: "For example, he testified that he was diagnosed with TB. This is incorrect. A Tuberculin skin test of February 5, 2004, was positive.

---

[40]The Court notes another inaccurate statement in the ALJ's decision, although the statement was not made in the context of the credibility determination. When discussing Plaintiff's medical records, the ALJ stated that an examining physician ruled out a bone spur in Plaintiff's left heel. (R. 20). Contrary to this statement, the relevant record indicates that Plaintiff would be referred for a podiatry consultation to rule out a bone spur in his left heel (R. 381), which could account for Plaintiff's complaints of foot pain, possibly impacting his ability to stand and walk for prolonged periods of time.

26

However, a medical report dated March 8, 2004 states "tuberculosis infection without disease." (R. 19). After consideration, the Court agrees with Plaintiff that the example provided by the ALJ to support his finding that the medical evidence did not substantiate Plaintiff's claims is nothing more than "semantic quibbling." (Pl's Brief, p. 9). Plaintiff's PPD test was positive for TB and, throughout his stay at the Coatesville VAMC, he was prescribed medication for TB infection, despite the absence of active TB disease. Accordingly, Plaintiff's testimony that he was diagnosed with TB is accurate and does not support the ALJ's adverse credibility determination.[41]

Finally, during the hearing, in response to questions by his counsel, Plaintiff testified that he suffers from dizziness and headaches, and that his doctors believe these conditions are side effects of his medications. (R. 33-34). The ALJ found Plaintiff to be less than credible based on the lack of evidence to substantiate Plaintiff's testimony that he suffers the side effects of dizziness and headaches from his medications. In

---

[41]In this connection, the Court notes that it is clear from Plaintiff's testimony and the brief filed in support of his motion for summary judgment that TB infection is not among the conditions which Plaintiff claims prevent him from performing substantial gainful activity. (Pl's Brief, p. 9). Thus, Plaintiff's TB infection is irrelevant for purposes of his application for DIB and provides no motivation for Plaintiff to testify falsely about this condition.

27

support of this finding, the ALJ noted that a record of the Coatesville VAMC dated September 3, 2004 indicates that Plaintiff denied any side effects from his medications. The ALJ further stated that he was "unable to locate anywhere in the medical record wherein the claimant made any complaints of serious side effects to medications. This reflects adversely on his credibility." (R. 20). Initially, the Court notes that contrary to the ALJ's statement regarding the alleged lack of any medical record reflecting a complaint of serious medication side effects by Plaintiff, there are, in fact, several records noting complaints of drowsiness from medications which could impact Plaintiff's ability to engage in substantial gainful activity on a regular and continuing basis. Specifically, a group therapy session note dated April 7, 2004 indicates that Plaintiff's medications made him drowsy, noting Plaintiff's difficulty in staying awake during the session (R. 325); a note by a health technician on July 28, 2004 indicates that Plaintiff reported drowsiness from his medications (R. 371); and a note by a health technician on August 29, 2004 indicates that Plaintiff complained of "little energy" and the failure of his pain medication to treat his pain at a level where he is comfortable. (R. 379). As to the alleged lack of evidence to support Plaintiff's testimony that he suffers from dizziness and headaches as a result of his medications, while this fact may

28

provide some support for an adverse credibility determination, several of Plaintiff's responses to this line of questioning by his counsel were inaudible as noted in the hearing transcript. (R. 33-34). Under the circumstances, the Court concludes that, on remand, the ALJ should consider further (1) the issue of complaints of side effects from Plaintiff's medications, (2) the impact, if any, of medication side effects on Plaintiff's ability to engage in substantial gainful activity on a regular and continuing basis, and (3) Plaintiff's credibility.

*William L. Standish*

William L. Standish
United States District Judge

Date: July **/2**, 2007

29